1
2
3
4
5
6
7
8

NOT FOR CITATION

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11
12

ANDREW E. ARMSTRONG,      )     No. C 07-00680 JF (PR)
                                )

13
14
15
16
17

           Plaintiff,     )     ORDER GRANTING MOTION FOR
                                )     SUMMARY JUDGMENT

  vs.                 )
                                )

TIMOTHY FRIEDERICHS, et al.,    )
                                )

           Defendants.    )
_____ )     (Docket No. 33)

18
19

    Plaintiff, a California prisoner proceeding pro se, filed the instant civil rights

20

action pursuant to 42 U.S.C. § 1983 against Correctional Training Facility personnel.

21

The Court found cognizable Plaintiff's claims that Defendants violated his Eighth

22

Amendment rights by: (1) acting with deliberate indifference to his safety based upon the

23

existing prison conditions; and (2) acting with deliberate indifference to his serious

24

medical needs, and ordered service on Defendants B. Curry, Dr .T. Friederichs and Dr. H.

25

Aung.  On September 22, 2009, the Court granted Defendant Curry's motion to dismiss

26

claim 1, and set a briefing schedule for the remaining medical claims against Defendants

27

Friederichs and Aung.  Defendants filed a motion for summary judgment on the grounds

28

that there is no genuine issue as to any material fact, and in the alternative, that they are

1  entitled to qualified immunity.  (Docket No. 33.)  Plaintiff filed opposition to Defendants'

2  summary judgment motion, and Defendants filed a reply.  After reviewing the complaint

3  and all submitted papers, the Court concludes that Defendants are entitled to summary

4  judgment and will GRANT Defendants' motion.

5

6                                          **DISCUSSION**

7  **I.    Standard of Review**

8          Summary judgment is proper where the pleadings, discovery and affidavits show

9  that there is 'no genuine issue as to any material fact and [that] the moving party is

10  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court will grant

11  summary judgment "against a party who fails to make a showing sufficient to establish

12  the existence of an element essential to that party's case, and on which that party will bear

13  the burden of proof at trial . . . since a complete failure of proof concerning an essential

14  element of the nonmoving party's case necessarily renders all other facts immaterial."

15  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect

16  the outcome of the lawsuit under governing law, and a dispute about such a material fact

17  is genuine "if the evidence is such that a reasonable jury could return a verdict for the

18  nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

19          Generally, the moving party bears the initial burden of identifying those portions

20  of the record which demonstrate the absence of a genuine issue of material fact.  See

21  Celotex Corp., 477 U.S. at 323.  Where the moving party will have the burden of proof on

22  an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could

23  find other than for the moving party.  But on an issue for which the opposing party will

24  have the burden of proof at trial, the moving party need only point out "that there is an

25  absence of evidence to support the nonmoving party's case."  Id. at 325.  If the evidence

26  in opposition to the motion is merely colorable, or is not significantly probative, summary

27  judgment may be granted.  See Liberty Lobby, 477 U.S. at 249-50.

28          The burden then shifts to the nonmoving party to "go beyond the pleadings and by

1   her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

2   file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>

3   <u>Corp.</u>, 477 U.S. at 324 (citations omitted).  If the nonmoving party fails to make this

4   showing, "the moving party is entitled to judgment as a matter of law." <u>Id.</u> at 323.

5        The court's function on a summary judgment motion is not to make credibility

6   determinations or weigh conflicting evidence with respect to a disputed material fact.  <u>See</u>

7   <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir.

8   1987).  The evidence must be viewed in the light most favorable to the nonmoving party,

9   and the inferences to be drawn from the facts must be viewed in a light most favorable to

10  the nonmoving party.  <u>See id.</u> at 631.  It is not the task of the district court to scour the

11  record in search of a genuine issue of triable fact.  <u>Keenan v. Allan</u>, 91 F.3d 1275, 1279

12  (9th Cir. 1996).  The nonmoving party has the burden of identifying with reasonable

13  particularity the evidence that precludes summary judgment.  <u>Id.</u>  If the nonmoving party

14  fails to do so, the district court may grant summary judgment in favor of the moving

15  party.  <u>See id.</u>; <u>see, e.g.</u>, <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026,

16  1028-29 (9th Cir. 2001).

17  **II.    Legal Claims and Analysis**

18       Plaintiff alleges that he suffered a slip and fall in the shower on October 14, 2005,

19  which rendered him unconscious for a few minutes and resulted in injuries to his head,

20  neck and back.  (Compl. 3.)  Plaintiff claims that he was not seen by a doctor until several

21  months later.  (<u>Id.</u> at 4.)  When he did finally see a doctor, Plaintiff alleges that Defendant

22  Friederichs merely examined his back, touched his chest twice, and then concluded that

23  Plaintiff was "alright." (<u>Id.</u>)  Plaintiff claims that because he was still experiencing pain

24  and dizziness due to the fall, he therefore requested an MRI and to be seen by an outside

25  specialist.  However, Defendant Friederichs denied the request for an MRI, diagnosing

26  that the symptoms were possibly due to scoliosis, and instead ordered X-rays.  (<u>Id.</u>)

27  Plaintiff alleges that he was later interviewed by Defendant Dr. Aung on January 23,

28  2006, who after a "look and a touch" stated that Plaintiff was "fine." (<u>Id.</u>)  Plaintiff

alleges that when he told Defendant Aung that he was experiencing a "shock" feeling throughout his entire body, Defendant Aung "acknowledged that this was due to the severity of the fall but, [] did not want to hear, nor was he concern[ed] with any of [Plaintiff's] ailments." (Id.)  Plaintiff alleges that Defendant Aung stated that he would only address the X-ray requests.  (Id.)  Plaintiff claims that his medical condition has deteriorated to the point where he is in constant pain and that he still experiences "shocks" throughout his body while nothing has been done to remedy the problem.  (Id. at 5.)  The Court found that Plaintiff's allegations, liberally construed, stated cognizable claims that Defendants violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs.

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc); Jones v. Johnson, 781 F.2d 769, 771 (9th Cir. 1986).  A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need.  See McGuckin, 974 F.2d at 1059.

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." McGuckin, 974 F.2d at 1059 (citing Estelle, 429 U.S. at 104).  The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment.  Id. at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps

1  to abate it.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).  The prison official must not

2  only "be aware of facts from which the inference could be drawn that a substantial risk of

3  serious harm exists," but he "must also draw the inference."  <u>Id.</u>  If a prison official

4  should have been aware of the risk, but was not, then the official has not violated the

5  Eighth Amendment, no matter how severe the risk.  <u>Gibson v. County of Washoe</u>, 290

6  F.3d 1175, 1188 (9th Cir. 2002).

7          In order for deliberate indifference to be established, therefore, there must be a

8  purposeful act or failure to act on the part of the defendant and resulting harm.  <u>See</u>

9  <u>McGuckin</u>, 974 F.2d at 1060; <u>Shapley v. Nevada Bd. of State Prison Comm'rs</u>, 766 F.2d

10  404, 407 (9th Cir. 1985).  A finding that the defendant's activities resulted in "substantial"

11  harm to the prisoner is not necessary, however.  Neither a finding that a defendant's

12  actions are egregious nor that they resulted in significant injury to a prisoner is required to

13  establish a violation of the prisoner's federal constitutional rights, <u>McGuckin</u>, 974 F.2d at

14  1060, 1061 (citing <u>Hudson v. McMillian</u>, 503 U.S. 1, 7-10 (1992) (rejecting "significant

15  injury" requirement and noting that Constitution is violated "whether or not significant

16  injury is evident")), but the existence of serious harm tends to support an inmate's

17  deliberate indifference claims, <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing

18  <u>McGuckin</u>, 974 at 1060).

19          A claim of medical malpractice or negligence is insufficient to make out a

20  violation of the Eighth Amendment.  <u>See</u> <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1060-61 (9th

21  Cir. 2004); <u>Hallett v. Morgan</u>, 296 F.3d 732, 744 (9th Cir. 2002);  <u>Franklin v. Oregon</u>,

22  662 F.2d 1337, 1344 (9th Cir. 1981); <u>see, e.g.</u>, <u>Frost v. Agnos</u>, 152 F.3d 1124, 1130 (9th

23  Cir. 1998) (finding no merit in claims stemming from alleged delays in administering pain

24  medication, treating broken nose and providing replacement crutch, because claims did

25  not amount to more than negligence); <u>McGuckin</u>, 974 F.2d at 1059 (mere negligence in

26  diagnosing or treating a medical condition, without more, does not violate a prisoner's 8th

27  Amendment rights); <u>O'Loughlin v. Doe</u>, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly

28  failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea and

1 pains is not constitutional violation; isolated occurrences of neglect may constitute

2 grounds for medical malpractice but do not rise to level of unnecessary and wanton

3 infliction of pain); Anthony v. Dowdle, 853 F.2d 741, 743 (9th Cir. 1988) (no more than

4 negligence stated where prison warden and work supervisor failed to provide prompt and

5 sufficient medical care).

6      1.   Claim against Defendant Dr. T. Friederichs

7      The following facts are not in dispute unless otherwise indicated.  Plaintiff's claim

8 against Defendant Friederichs is based solely on the medical examination that took place

9 on December 1, 2005.  (Compl. 4; Pl.'s Depo. 53:24-25, 54:1-4) (Docket No. 36).

10 According to Plaintiff's medical records, he fell and hit his head in the prison showers on

11 October 14, 2005.  (Friederichs Decl. at 2; Attach. MR 071.)  Plaintiff submitted a written

12 request three days later to the CTF medical clinic, stating that since his fall in the shower,

13 he was experiencing "bad headaches," that his neck and back were very sore, and that his

14 chest was "sensitive to the touch."  (Id.)  The medical staff responded to what they

15 assessed to be a non-emergency situation by scheduling a doctor's appointment for

16 Plaintiff on the next available date, which was December 1, 2005.  (Id. at 3.)

17      On December 1, 2005, the medical staff weighed Plaintiff and recorded the

18 following four vital signs: 1) body temperature, 2) pulse rate, 3) respiration rate, and 4)

19 blood pressure.  (Id.; Attach. MR 071.)  The results were found to be normal for someone

20 of Plaintiff's size and age.  (Id.)  Then Plaintiff was examined by Defendant Dr.

21 Friederichs, who was a staff physician and surgeon at CTF since 1998.  (Friederichs Decl.

22 at 2.)  Defendant Friederichs has been board certified in family medicine by the American

23 Board of Family Medicine since 1979, and has examined and treated thousands of

24 patients with head-related injuries, back and neck problems, neurological deficiencies,

25 muscle strain, headaches, pains and soreness, among other things.  (Id.)  When he saw

26 Plaintiff on December 1, 2005, Defendant Friederichs applied and recorded the

27 examination under the "SOAP" format used by medical professionals to record the

28 following: subjective observations, objective observations, an assessment (diagnosis), and

1  a treatment plan.  (Id. at 3.)  Defendant Friederichs' subjective observation notes

2  indicated that Plaintiff informed him that he had lost consciousness for one or two

3  minutes in October 2005, when he fell and hit his head in the showers, and that he had

4  headaches and back pain.  (Id.; Attach. MR 072.)  Plaintiff's subjective statements were

5  clinically significant because the first twenty-four hours after a head injury or loss of

6  consciousness are the most critical time period.  (Id. at 4.)  A patient who was

7  unconscious for more than two minutes would typically be admitted to a hospital for a 24-

8  hour observation period, and if necessary, a CT scan.  (Id.)  In Plaintiff's case, it does not

9  appear that he was unconscious long enough to warrant hospitalization.

10  Although Plaintiff claims that he complained of dizziness as well as pain from the

11  incident, (Compl. 4), no other subjective observations were noted during the examination,

12  such as interference with memory, judgment, reflexes, speech, balance and coordination,

13  to indicate to Defendant Friederichs that Plaintiff was suffering from a serious head

14  injury.  Rather, Defendant Friederichs noted that Plaintiff's neurological system was

15  "intact," which means generally that Plaintiff's cognitive and motor skills were

16  functioning fine.  (Friederichs Decl. at 4.)  Defendant Friederichs states that since he

17  examined Plaintiff almost seven weeks after the purported head injury, any head

18  concussion would have "undoubtedly resolved itself."  (Id.)  Furthermore, Plaintiff

19  displayed none of the symptoms during the examination to indicate that he was still

20  suffering a concussion, such as interference with memory, judgment, reflexes, speech,

21  balance and coordination.  (Id.)

22  Defendant Friederichs states that in light of Plaintiff's statements and the passage

23  of time since the purported head injury, he would have looked for objective symptoms

24  consistent with a delayed subdural hematoma, a blood cot that forms between the skull

25  and the brain, such as bruises around eyes and ears.  (Id.)  Depending on the severity of

26  the injury, patients may also experience the following symptoms: confusion, loss of

27  consciousness, blurred vision, severe headaches, vomiting, memory loss, slurred speech,

28  difficulty walking, weakness or loss of sensation on one half of the body, seizures, change

in skin color, behavioral changes, and blood or clear fluid draining from the ears o nose, among others.  (Id.)  In Plaintiff's case, Defendant Friederichs found that there were not enough symptoms to diagnose subdural hematoma or any other serious head injury, which would have warranted a referral to a specialist or the local hospital for further evaluation and testing.  (Id. at 5.)

In response to Plaintiff's complaints of soreness and based on his description, Defendant Friederichs examined Plaintiff's back and chest and diagnosed him with having "neck (right trapezius) and back (right latissimus dorsi) muscle strain."  (Id.; Attach. MR 066.)  Defendant Friederichs also observed a prominent right rib hump on Plaintiff's back, which indicated scoliosis (curvature of the spine).  (Id.; Attach. MR 072.) Defendant Friederichs noted "possible scoliosis" in his notes for the medical staff to monitor the condition at future medical appointments, and ordered X-rays of Plaintiff's chest and spine to confirm his preliminary diagnosis and to uncover any hidden problems. (Id.; Attach. MR 066.)  The X-ray results for Plaintiff's upper (thoracic) and lower (lumbar) back regions and neck (cervical) came back normal.  The only abnormality was in certain areas of Plaintiff's neck spine, i.e., the C3-4, C4-5 area, which showed "spondylosis with diminished disc height and spurring."[1]  (Id. at 6; Attach. MR 222.)

---

[1] Defendant Friederichs describes the nature of spondylosis and treatment in his declaration, which Plaintiff does not dispute: "Cervical spondylosis is a common degenerative condition that is generally referred to as age-related wear and tear affecting the joints in a person's neck. Aging causes the bones and cartilage in the backbone and neck region to gradually deteriorate and sometimes form bone spurs (irregular bony outgrowths). These changes occur in everyone's spine. Patients with cervical spondylosis may sometimes experience, among other things, stiffness, pain, unsteady gait, abnormal reflexes, and tingly or pinprick sensations (sometimes described as "shocks") in their hands and legs, which are caused by nerve compression and lack of blood flow.  Still, many people with signs of cervical spondylosis on X-rays manage to escape the associated symptoms. Treatment for spondylosis is usually conservative in nature and commonly treated by nonsteroidal anti-inflammatory drugs (e.g., ibuprofen), physical modalities (e.g., therapeutic interventions that use physical methods like heat, cold, massage, or exercise to relieve pain), and lifestyle modifications (e.g., avoid high-impact or strenuous activities)."  (Friederichs Decl. at 6.)

1   Plaintiff's X-rays also confirmed Defendant Friederichs' preliminary scoliosis diagnosis,

2   although in a moderate state.  (Id.; Attach. MR 220.)  According to Defendant

3   Friederichs, the cause of scoliosis is relatively unknown, and in most cases does not cause

4   back pain.  (Id. at 6.)  Based on his training and experience, Defendant Friederichs did not

5   believe that the fall in the shower caused the moderate scoliosis in Plaintiff's case.  (Id.)

6   Defendant Friederichs informed Plaintiff about the nature of scoliosis and the need for

7   future monitoring.  He also prescribed 600 mg of Motrin (ibuprofen) for thirty days for

8   Plaintiff's complaints of pain, soreness and tenderness.  (Id. at 6-7.)

9       Defendant Friederichs argues that he did not exhibit deliberate indifference to

10  Plaintiff's medical needs, let alone a serious one, during the December 1, 2005

11  examination, and is entitled to judgment as a matter of law.  (Defs.' Mot. at 18.)  In

12  support of the motion for summary judgment,  Defendant Friederichs has submitted a

13  personal declaration and copies of Plaintiff's medical records documenting the medical

14  treatment Plaintiff received from Defendant Friederichs on December 1, 2005.  Plaintiff

15  does not dispute the evidence contained in the medical records provided by Defendant.

16  Rather, Plaintiff's sole complaint is that Defendant Friederichs denied his requests for an

17  MRI and a referral to an outside specialist.  (Compl. 4.)  However, Defendant Friederichs

18  asserts that he had no concrete reason to recommend an MRI because Plaintiff presented

19  no neurological deficiencies or other symptoms not adequately covered by the physical

20  examination and the X-rays.  (Friederichs Decl. at 7.)  In opposition, Plaintiff merely

21  repeats his claims from the complaint and asserts that Defendant Friederichs denied his

22  requests for an MRI and an outside specialist and "would only set an appointment for x-

23  rays."  (Oppo. at 5.)

24      It is clear that the facts alleged by Plaintiff, if true, do not amount to deliberate

25  indifference to serious medical needs by Defendant Friederichs.  As discussed above, the

26  medical records submitted by Defendant Friederichs show that Defendant Friederichs

27  examined Plaintiff as scheduled on December 1, 2005, to treat the pains he complained

28  of, i.e., headaches, neck and back pains, and chest soreness.  See supra at 6-8.  Defendant

1  Friederichs was able to reasonably rule out a concussion and subdural hematoma based

2  on subjective and objective observations.  Id. at 6-7.  Defendant Friederichs addressed

3  Plaintiff's complaints regarding his back and chest pains and ordered X-rays, which

4  confirmed that Plaintiff was suffering from spondylosis, a common degenerative

5  condition that is generally referred to as age-related wear and tear affecting the neck

6  joints, and moderate scoliosis.  Id. at 7.  Furthermore, Defendant Friederichs prescribed

7  medication for Plaintiff's complaints of pain, soreness and tenderness and did not

8  disregard them.  Id. at 8.  Rather, Plaintiff's claim that Defendant Friederichs denied his

9  request for an MRI and a referral to an outside specialist states a difference in opinion in

10  the treatment he received.  However, "[a] difference of opinion between a prisoner-patient

11  and prison medical authorities regarding treatment does not give rise to a § 1983 claim."

12  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  Similarly, a showing of nothing

13  more than a difference of medical opinion as to the need to pursue one course of

14  treatment over another is insufficient, as a matter of law, to establish deliberate

15  indifference, see Toguchi, 391 F.3d at 1058, 1059-60; Sanchez v. Vild, 891 F.2d 240, 242

16  (9th Cir. 1989); Mayfield v. Craven, 433 F.2d 873, 874 (9th Cir. 1970).  Furthermore,

17  there is no indication that Defendant Friederichs knew that Plaintiff faced a substantial

18  risk of serious harm and disregarded that risk by failing to take reasonable steps to abate

19  it.  See Farmer, 511 U.S. at 837.  Or, put differently, there is no indication that the course

20  of treatment Defendant Friederichs chose was medically unacceptable under the

21  circumstances and that he chose this course in conscious disregard of an excessive risk to

22  Plaintiff's health.  See Toguchi, 391 F3d at 1058; Jackson 90 F3d at 332.  The fact that

23  Plaintiff was able to play basketball just a day after the examination, and continued

24  thereafter to do so on a regular basis, (Pl.'s Depo. 8:19-25, 9:1-13), indicates that he was

25  not in a concussive state or suffering a damaged neurological system which Defendant

26  Friederichs failed to treat.  In opposition, Plaintiff has failed, by "go[ing] beyond the

27  pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories,

28  and admissions on file,'" to "designate 'specific facts to show that there is a genuine issue

1  for trial'" with respect to his medical claim against Defendant Friederichs.  <u>Celotex Corp.</u>,

2  477 U.S. at 324.  Accordingly, Defendant Friederichs is entitled to summary judgment on

3  this claim.  <u>Id.</u> at 323.

4          2.    <u>Claim against Defendant Dr. Aung</u>

5        The following facts are not in dispute unless otherwise indicated.  Plaintiff's claim

6  against Defendant Aung is based solely on the medical examination that occurred on

7  January 23, 2006.  (Compl. 4-5; Pl.'s Depo. 32:1-15.)  On December 26, 2005, Plaintiff

8  requested to know the results of the X-rays from Dr. Friederichs' examination, and

9  complained of sharp pain in his upper back and a stiff neck.  (Aung Decl. at 2; Attach.

10  MR 151, 219-22.)  The medical staff scheduled an appointment for January 23, 2006. (<u>Id.</u>

11  at 3; Attach. MR 067.)

12        On January 23, 2006, the staff weighed Plaintiff and monitored his body

13  temperature, pulse rate, respiration rate and blood pressure.  (<u>Id.</u>)  The results were found

14  to be normal for someone of Plaintiff's size and age.  (<u>Id.</u>)  Then Plaintiff was examined

15  at the CTF's satellite medical clinic, North Unit, by Defendant Dr. Aung, who was a staff

16  physician and surgeon at CTF at the time.  (<u>Id.</u> at 2-3; Attach. MR 067-68.)  Prior to his

17  retirement from CTF in 2009, Defendant Aung had practiced medicine for almost twenty

18  years, and examined and treated thousands of patients with head-related injuries, back and

19  neck problems; neurological deficiencies; muscle strain; headaches; pains and soreness,

20  among other things.  (<u>Id.</u> at 2.)  At the start of the examination, Defendant Aung informed

21  Plaintiff that his X-ray report was not in his medical chart.  (<u>Id.</u> at 3.)  To avoid any delay

22  in Plaintiff's diagnosis and treatment by rescheduling the visit, Defendant Aung called the

23  radiology department at CTF's central medical facility which faxed a copy of the X-ray

24  report to him.  (<u>Id.</u>)  Defendant Aung discussed the findings with Plaintiff based on the X-

25  ray reports, which showed moderate scoliosis and spondylosis as stated in Defendant

26  Friederichs' declaration.  (<u>Id.</u>)  Defendant Aung then proceeded with an examination

27  based on the "SOAP" format, i.e., subjective, objective, assessment, and plan, which is

28  identical to the steps followed by Defendant Friederichs.  <u>See</u> <i>supra</i> at 6.  Defendant

1 Aung states that Plaintiff informed him that: "1) he fell in the prison showers three to four
2 months prior; 2) that he had back pain for an unspecified period of time ("months"); 3)
3 that the pain site was the right shoulder-blade area; 4) that he had no weakness or
4 numbness; and 5) that he was employed as a yard-crew member." (Id.; Attach. MR 068.)
5 Plaintiff claims in the complaint that he told Defendant Aung of a "shock" feeling that he
6 was experiencing throughout his entire body, and that Defendant Aung "acknowledged
7 that this was due to the severity of the fall, but he did not want to hear, nor was he
8 concern[ed] with any of [Plaintiff's] ailments." (Compl. 4.) Plaintiff alleges that
9 Defendant Aung replied that "'Doctor(s) doesn't [sic] know everything,'" and that he was
10 only going to address what was on Plaintiff's medical request. (Id.) Defendant Aung
11 argues that the medical notes do not reflect any complaint of "shock" feeling by Plaintiff
12 at the January 23rd examination. (Aung Decl. at 5; Attach. MR 068.) Defendant Aung
13 asserts that even assuming Plaintiff reported neck and head injuries and shocks during the
14 examination, the recorded objective and subjective symptoms reflected no serious or
15 lingering effects from the October 2005 fall in the shower. (Id.) Defendant Aung asserts
16 that Plaintiff made no indication of weakness or numbness, two essential factors to help
17 diagnose internal damage. (Id. at 5; Attach. MR 068.) Plaintiff also stated that he was
18 yard-crew member, which entails intensive physical labor and requires excellent physical
19 health. (Id.) Defendant Aung argues that a person with spinal, brain, neck, or nerve
20 damage would not be able to perform such physical labor. (Id.) Defendant Aung noted
21 that Plaintiff did not have a stiff neck and that he had no fever, which negated preliminary
22 meningitis diagnosis (an infection of the fluid that surrounds the brain and the spinal
23 cord). (Id. at 6.) Defendant Aung states that the "lack of a fever is significant because
24 such a fever is a risk factor for infection." (Id.)
25 　　　When Plaintiff complained of pain in his right shoulder-blade (inner scapular),
26 Defendant Aung narrowed his diagnosis toward a condition affecting the body, e.g.,
27 overuse or overstretching of a muscle causing myalgia (muscle pain). (Id.) During the
28 examination, Defendant Aung observed the following: Plaintiff stood, sat, and walked

1   normally; Plaintiff had a full range of motor skills, including a normal deep-tendon reflex,

2   a strong bilateral hang drip, and normal bilateral upper extremities; Plaintiff presented no

3   symptom indicating any muscle loss; and when Plaintiff's right shoulder-blade area was

4   pressed, Plaintiff reaced with or presented no pain, swelling, or redness.  (Id.)

5   Defendant Aung found that the X-ray findings, combined with the physical examination,

6   did not provide any concrete need for further testing.  Defendant Aung diagnosed Plaintiff

7   with "possible myalgia" in the shoulder-blade area.  (Id.)  As a precautionary measure,

8   Defendant Aung ordered an X-ray of Plaintiff' shoulder-blade area to confirm his

9   preliminary diagnosis, to scan for any bone fracture in that area, and to uncover any

10  unobservable problems.  (Id.; Attach. MR 150.)  The X-ray results came back normal,

11  showing no dislocation between the shoulders and arms and no bone abnormality in the

12  areas.  (Id. at 6-7; Attach. MR 218.)  Defendant prescribed 650 mg of Tylenol

13  (acetaminophen) for thirty days to relieve Plaintiff's complaints of pain.  (Id. at 7.)

14  Defendant Aung explained to Plaintiff that he was prescribing acetaminophen rather than

15  ibuprofen because long-term use of the latter could cause kidney and liver failure,

16  stomach bleeding, and edema, among other things.  (Id.)  Plaintiff agreed to the transition

17  to acetaminophen.  (Id.)  Defendant Aung instructed Plaintiff to avoid strenuous exercise

18  and sports to allow the body to heal itself and to alleviate any problems associated with

19  aging or pain .  (Id. at 8.)

20       Plaintiff alleges that he had to raise his voice to an "abnormal level" when he told

21  Defendant Aung about the "shock" feelings he was experiencing since the fall.  (Compl.

22  5.)  Plaintiff claims that Defendant Aung's response to this complaint was to take him off

23  ibuprofen and put him on Tylenol and set and appointment for another round of X-rays.

24  (Id.)  Plaintiff was clearly not satisfied with the course of treatment prescribed by

25  Defendant Aung, i.e., the refusal to order an MRI.  However, similar to his claim against

26  Defendant Friederichs, Plaintiff's disagreement with Defendant Aung's course of

27  treatment does not give rise to a § 1983 claim, see Franklin, 662 F.2d at 1344, and a

28  showing of nothing more than a difference of medical opinion as to the need to pursue

1   one course of treatment over another is insufficient, as a matter of law, to establish

2   deliberate indifference, see Toguchi, 391 F.3d at 1058, 1059-60.  Based on Defendant

3   Aung's declaration and the medical records submitted in support thereof, it is clear that

4   Defendant Aung addressed the concerns stated in Plaintiff's medical request, *i.e.*, to know

5   the results of his previous X-rays and for treatment of his upper back pain and stiff neck.

6   (Aung Decl. at 7; Attach. MR 067.)  Assuming that Plaintiff also complained of "shock"

7   feelings during the examination which Defendant Aung allegedly acknowledged but

8   failed to record, there is no indication that Defendant Aung knew, based on the "shock"

9   feelings, that Plaintiff faced a substantial risk of serious harm and disregarded that risk by

10  failing to take reasonable steps to abate it, see Farmer, 511 U.S. at 837.  Nor can it be said

11  that the course of treatment Defendant Aung chose was medically unacceptable under the

12  circumstances and that he chose this course in conscious disregard of an excessive risk to

13  Plaintiff's health.  See Toguchi, 391 F3d at 1058; Jackson 90 F3d at 332.  Based on

14  subjective and objective observations, Defendant Aung reasonably concluded that

15  Plaintiff was not suffering from late complications from his slip-and-fall in the shower:

16  Plaintiff's vital signs were normal; he appeared healthy and muscular; his motor skills and

17  upper extremities were functioning fine; his neurological system was intact; and he had

18  no numbness, weakness, muscle loss, swelling, tenderness, or fever.  (Aung Decl. at 8.)

19  Without any symptoms to indicate a serious, systematic problem, Defendant Aung had no

20  concrete medical reason to order an MRI despite Plaintiff's preference and opinion.  In

21  opposition, Plaintiff has failed to show that there is a genuine issue for trial.  Celotex

22  Corp., 477 U.S. at 324.  Accordingly, Plaintiff's claim fails as a matter of law and

23  summary judgment is GRANTED to Defendant Aung on Plaintiff's Eighth Amendment

24  claim.  Id. at 323.

25      Having reviewed the pleadings and all submitted papers on this matter, the Court

26  finds that Plaintiff's allegations do not establish that Defendants acted with deliberate

27  indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment.

28  Accordingly, Defendants are entitled to judgment on these claims as a matter of law.  See

1  <u>Celotex Corp.</u>, 477 U.S. at 323.[2]

2

3                                    **CONCLUSION**

4          For the foregoing reasons, Defendants Friederichs and Aung's motion for

5  summary judgment (Docket No. 33) is GRANTED.

6          This order terminates Docket No. 33.

7          IT IS SO ORDERED.

8  DATED: _____5/19/10_____     _____

9                                          JEREMY FOGEL
                                           United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27          [2] Because the Court finds that no constitutional violation occurred, it is not

28  necessary to reach Defendants' qualified immunity argument.

# UNITED STATES DISTRICT COURT

## FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

ANDREW ARMSTRONG,

                Plaintiff,

  v.

TIMOTHY FRIEDERICHS, et al.,

                Defendants.

           Case Number: CV07-00680 JF

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on 5/26/10 , I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Andrew Emil Armstrong H-44225
Correctional Training Facility
PO Box 689
E-135
Soledad, CA 93960-0689

Dated: 5/26/10

           Richard W. Wieking, Clerk